IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **CAPITAL RISK MANAGEMENT, INC.,** | * | |
| **PLAINTIFF,** | * | |
| | * | |
| v. | * | 2:05cv1104-MHT |
| | * | |
| **ADVANCED HEALTHCARE** | * | |
| **MANAGEMENT CORPORATION,** a | * | |
| corporation; **MILLENNIUM BUSINESS** | * | |
| **ASSOCIATION OF AMERICA, Inc.,** a | * | |
| corporation, | * | |
| **DEFENDANTS.** | * | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On September 8, 2006 at 10:00 a.m., this Court held an evidentiary hearing on the Plaintiff Capital Risk Management, Inc.'s motion for default judgment. The Plaintiff Capital Risk Management, Inc. waived its request for a jury trial on the issues in the above referenced cause of action against the default defendant, Millenium Business Association of America, Inc., solely for the purposes of this hearing. Following the evidentiary hearing, and the testimony and evidence adduced therein, the Court finds as follows:

1) Capital Risk Management, Inc. is an Alabama corporation which is in the business of providing, among other things, health insurance to its customers.

2) Millennium Business Association of America, Inc. ("MBAA") is a foreign corporation with its principal place of business in Albany, New York.

3) The matter in controversy exceeds the sum of $75,000.00.

4) MBAA was properly served with the summons and complaint and has failed to respond at all, let alone in a timely fashion, as required under the Federal Rules of Civil

Procedure.

5) In the fall of 1999, CRM was managing the health care benefits for the American Hospitality Association (AHA), which at that time had approximately 500 unit members. The Third Party Administrator (TPA) for the AHA was HealthStrategies. Over time, HealthStrategies' effectiveness as a TPA had deteriorated; it was not paying claims in a timely manner, if at all, among other issues. Accordingly, CRM needed to find a new association and TPA in which to enroll the AHA plan members in order to continue to provide them with health care benefits.

6) In the fall of 1999, CRM's president, Ron Howard, approached MBAA, which was an organization that sponsored an association plan similar to that of the AHA plan, and which used an "in-house" TPA, Advanced Healthcare Management Corporation, to determine if MBAA could replace HealthStrategies.

7) Ron Howard flew to Albany, New York to meet with Robert Aldunate, the president of MBAA, Peter D. Perry, the president of Advanced and the vice-president of Advanced. In the course of his visit, he toured the MBAA/Advanced offices, spoke to several of the people who handled claims and observed the manner in which MBAA and Advanced were doing business. At the conclusion of his visit, Mr. Howard on behalf of CRM, Robert Aldunate, on behalf of MBAA and Peter D. Perry and the vice-president, on behalf of Advanced, agreed to negotiate a contract which would allow the members of AHA to be enrolled in the MBAA Association Health Plan which used Advanced as its TPA.

8) CRM and MBAA agreed that on December 15, 1999, certain members of the AHA, namely the Emerald Coast Health Alliance, would be enrolled in the

MBAA/Advanced health plan and begin receiving services from MBAA/Advanced as of that date, and that on January 1, 2000, the remaining members of the AHA would be enrolled in the MBAA/Advanced health plan. In addition, the contract between the parties provided in particular that MBAA/Advanced would accept all of the AHA members and provide them with the MBAA health plan and that there would be a 2 month moratorium on premium payments to MBAA/Advanced. During that 2 month period, the money that normally would be used as payments to MBAA/Advanced for premiums was to be used instead by MBAA/Advanced to pay claims that had not been paid by Health Strategies. In addition, CRM agreed to provide MBAA/Advanced with an additional $105,000 that was in the AHA claims account as of January 1, 2000 to be used for the payment of claims not paid by HealthStrategies. MBAA/Advanced also agreed to reprocess all of HealthStrategies' claims with the AHA plan in order to determine whether the claims were adjudicated and paid correctly, and if any claims were paid incorrectly, MBAA/Advanced agreed to attempt to recoup any overpayments from the medical providers. MBAA/Advanced also agreed to process all unprocessed claims from Health Strategies. These unprocessed claims were also to be paid from the $105,000 in the claims account and the two months worth of premiums.

9) As agreed and pursuant to the contract, CRM provided MBAA/Advanced with the $105,000 and the two months of premiums for January and February, 2000, and enrolled the Emerald Coast Health Alliance in the MBAA plan by December 15, 1999 and the remaining AHA members that chose to participate in the MBAA plan by January 1, 2000. CRM assigned its stock as collateral to MBAA/Advanced. Said stock is still in MBAA/Advanced's possession.

10) CRM paid premiums to MBAA/Advanced for the enrolled members from January, 2000 though September, 2000. The premium income began at around $100,000 per month but reduced some each month. During that time period, MBAA/Advanced did not pay the previous claims from HealthStrategies, nor pay the vast majority of the claims of the AHA members enrolled in the MBAA health plan.

11) In September, 2000, MBAA/Advanced terminated the MBAA health plan retroactive to June 30, 2000 and refunded to CRM three months of premium payments for July, August and September of 2000. However, neither the initial $105,000 claims account payment nor the January through June premiums, which totaled $427,000, were ever refunded to CRM. An accounting or audit has never been provided. In addition, CRM's stock was not returned to it, and the stock assignment was not released.

12) As a result of MBAA's failure to pay the previous HealthSTrategies claims and the claims of AHA members enrolled in the MBAA health plan, CRM was the subject of numerous lawsuits and suffered a severe blow to its reputation as well as lost profits.

## CONCLUSIONS OF LAW

1) The Defendant, MBAA, is in default and accordingly default judgment is entered against it in an amount to be set forth more fully herein.

2) MBAA has fully breached its contract with CRM, and the damages from that breach of contract constitute the following:

a) The $105,000 claims account payment; and

b) The January through June premium payments of $427,000.00;

c) Pre-judgment interest for the claims account payment and the January through

        June premium payments; and

d)     Attorneys fees and costs.

3)     MBAA's conduct was wanton and performed in conscious disregard of its duty to CRM to properly administer the AHA health plan. In addition, MBAA had sure knowledge that CRM would be injured by its failure to properly administer the AHA health plan and by its failure to process or pay the vast majority of the claims from the former AHA members. The damages from MBAA's wanton conduct that are additional to the damages for the breach of contract are the following:

        a)     Injury to CRM's reputation in the amount of $500,000; and

        b)     Lost profits to CRM in the amount of $125,000;

4)     MBAA's wanton conduct was sufficiently deserving of punishment to require the imposition of punitive damages. The Due Process Clause of the United States Constitution does not permit a "grossly excessive" punishment to be imposed on a tortfeasor. *See, BMW v. Gore*, 517 U.S. 559, 562 (1996). In the *Gore* case, the United States Supreme Court established three guideposts at which a court should look to determine whether a punitive damages award comports with due process. These three guidelines are the following:

a)     The degree of reprehensibility of the conduct;

b)     The disparity between the harm or potential harm suffered by the plaintiffs and the punitive damages award; and

c)     The difference between the punitive damages award and relevant penalties authorized or imposed in comparable cases.

*Gore*, 517 U.S. at 575.

In the *Gore* case, the United States Supreme Court stated that the most important of the three guideposts is the degree of reprehensibility of the defendant's conduct. "As the Court stated nearly 150 years ago, exemplary damages imposed on a defendant should reflect the 'enormity of his offense.'" *Gore*, 517 U.S. at 575. MBAA's conduct in this case is truly reprehensible because MBAA deliberately took money intended to be used to pay the health claims of individuals and used it for purposes or purposes unknown. The Court takes judicial notice of the fact that health insurance is an important benefit to individuals that is essential to their well-being and optimal health. To wantonly administer a plan in which MBAA was, in essence, acting as a fiduciary for the claims members is a breach of trust that warrants the most severe penalties.

However, the court recognizes as well that, while the damage to the individual AHA members may have included a physical component, the damage to CRM is solely economic. In addition, the Court has provided CRM with a substantial economic recovery in this order in an amount exceeding one million dollars. Accordingly, the Court finds that a 1 to 1 punitive damages ratio in this case is sufficient to deter MBAA from such reprehensible conduct in the future, and accordingly awards CRM punitive damages on its claim against MBAA in the amount of $1,157,000.00.

## JUDGMENT

Based on the foregoing, the Court finds for CRM and against MBAA and orders the following relief for CRM:

1) MBAA shall pay compensatory damages to CRM in the amount of

       $1,157,000.00;

2)     MBAA shall pay pre-judgment interest on the sum of $532,000.00, related to the damages for breach of contract;

3)     MBAA shall pay attorney's fees and costs to CRM for this action;

4)     MBAA shall pay punitive damages to CRM in the amount of $1,157,000.00; and

5)     MBAA shall return CRM's stock certificate to it forthwith.

So Ordered on this the ____ day of September, 2006.

 

_____
District Court Judge